Daniel S. Robinson (SBN 244245)
Michelle M. West (SBN 228737)
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Dr.
Newport Beach, CA 92660
Telephone: (949) 720-1288
drobinson@robinsonfirm.com
mwest@robinsonfirm.com

George A. Hanson (*pro hac vice forthcoming*)
Larkin E. Walsh (*pro hac vice forthcoming*)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: 816-714-7100
hanson@stuevesiegel.com
walsh@stuevesiegel.com

*Additional Plaintiffs' Counsel Listed on Signature Page*

*Counsel for Plaintiffs and the Putative Class*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAB PACLEB WY, AND JOSIE ANNE LADUA LEYSA; individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>WESTWAYS STAFFING SERVICES, INC., and UNIVERSAL HEALTH SERVICES, INC.,<br><br>    Defendants. | Case No.<br><br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

## **TABLE OF CONTENTS**

NATURE OF THE ACTION ....................................................................1

PARTIES ...............................................................................................5

JURISDICTION AND VENUE .............................................................6

COMMON ALLEGATIONS OF FACT ................................................7

    A.   Westways' Recruitment of Foreign Nurses ...........................7

    B.   The Venture: Relationships among Westways, its Client
          Employers, and the Foreign-born Nurses they Employ. .....................11

         1.   Westways and UHS Are Jointly Responsible to Ensure
               Foreign-Born Nurses are Paid in Compliance with the Law. ....11

         2.   Westways' Relationship with its Client Employers, like
               UHS, is one of contract and/or agency. ....................................14

    C.   Westways Uses Unlawful Means – Including Threats of Serious
          Harm and the Abuse of Legal Process – to Prevent Foreign
          Nurses from Leaving Employment. .....................................16

PLAINTIFFS' FACTUAL ALLEGATIONS ..........................................18

    A.   Westways' Recruitment and Hiring of Plaintiff Tab Wy ...................18

    B.   Westways' Recruitment and Hiring of Plaintiff Josie Leysa ..............20

    C.   Westways Presents Work Placements with Materially
          Different Terms...................................................................22

    D.   Westways Threatens Plaintiffs with Serious Harm if they
          Leave Westways' Employ....................................................25

         1.   Westways Threatens Significant Financial Harm, Demanding
               $40,000+ for Plaintiffs to "Buy Out" their Contracts.............26

         2.   Westways Threatens to Terminate Visa Sponsorship, Report to
               Governmental Authorities and Credit Reporting Agencies,
               and to Pursue Legal Action with "Loser Pays" Provision. .......28

i

E.    UHS Knows or Should Know that Westways is Recruiting or Obtaining the Labor of Plaintiffs and Other Foreign Nurses in Violation of the Law. ............................................................30

F.    Plaintiffs and Those Similarly Situated Have Suffered Significant Harm, Financially and Otherwise, As a Result of Defendants' Conduct. ..............................................................33

CLASS ACTION ALLEGATIONS .........................................................35

COUNT I - FORCED LABOR, 18 U.S.C. §§ 1589(a), 1595 ..................................38

COUNT II - TRAFFICKING IN FORCED LABOR, 18 U.S.C. §§ 1590(a), 1595 ..................................40

COUNT III - HUMAN TRAFFICKING UNDER CALIFORNIA CIVIL CODE § 52.5 ..............................................41

COUNT IV – DECLARATORY JUDGMENT ....................................43

PRAYER FOR RELIEF ........................................................44

JURY DEMAND ................................................................47

Sunlight, it has been said, is the best disinfectant.[1] Nowhere can this be more true than when it comes to exposing labor trafficking within the healthcare industry. Plaintiffs Tab Pacleb Wy and Josie Anne Ladua Leysa ("Plaintiffs") bring this class action complaint against Westways Staffing Services, Inc., ("Westways") and its health system client, Universal Health Systems, Inc. ("UHS") (collectively, "Defendants") individually and on behalf of the classes defined herein, to shine a light on Westways' practices of recruiting, obtaining, providing, and benefitting from the labor and services of foreign-born nurses through the use of fraud, deception, coercion, threats of serious harm, and an abuse of the immigration process that has resulted in the forced labor and wage exploitation of the Plaintiffs and others similarly situated.

Plaintiffs simultaneously seek to spotlight the role of hospital facilities and health systems such as UHS, who, rather than demand that staffing agencies like Westways commit to its contracts with these nurses consistent with the law, instead position themselves to have plausible deniability, and turn a blind eye to labor trafficking in order to continue benefiting from the labor of foreign nurses like Plaintiffs.

Plaintiffs' allegations with respect to themselves are based on personal knowledge as to their own actions and their counsels' investigations, and upon information and belief as to all other matters, as follows:

## **NATURE OF THE ACTION**

1.    The United States healthcare industry has a well-documented history of importing foreign-educated nurses to fill critical patient-care gaps in U.S. facilities. Indeed, the Department of Labor has, for decades, designated professional nurses as

---

[1] Louis Brandeis, *What Publicity Can Do*, Harper's Weekly, Dec. 1913 (reprinted in *Other People's Money and How the Bankers Use It* (Frederick A. Stokes Co., 1st Ed. 1914).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

a "Schedule A" occupation, meaning there is a shortage of U.S. workers who are able, willing, qualified, and available for this occupation. See 20 C.F.R. § 656.5.

2.    The United States recruits nurses from all over the world, but no country has contributed more when it comes to filling critical nursing positions than the Philippines. It is the world's top exporter of nurses:[2] Filipinos account for 27% of foreign-born registered nurses, according to the Migration Policy Institute,[3] with at least 17,000 Filipino nurses signing overseas contracts in 2019 alone.[4] The COVID-19 pandemic only exacerbated the already significant nursing shortage in U.S. healthcare facilities.

3.    The desire for Filipino nurses to work abroad, especially in the United States, is strong: "ultimately, the promised land is the U.S.," as one Filipino nurse stated.[5]

4.    The U.S. demand for foreign-born nurses, and the desire of those nurses—particularly Filipino nurses—to immigrate to the United States, has given rise to complex and exploitative practices. To maximize their profits, international staffing agencies are engaging in deceptive recruitment tactics to lock up Filipino nurses, and then imposing oppressive contract provisions, psychological

---

[2] Jeff Clyde G. Corpuz, *Advancing Filipino Healthcare: The Plight of Filipino Nurses in a Postpandemic World*, SAGE Open Nursing, Jan. – Dec. 2023, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10722941/ (last accessed Mar. 8, 2024) (citing Robredo, Janine P., et al; *Outmigration and unequal distribution of Filipino physicians and nurses: An urgent call for investment in health human resource and systemic reform*, July 2022, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9283652/#:~:text=In%202019%20alone%2C%20at%20least%2017%2C000%20Filipino%20nurses%20signed%20overseas%20contracts.&text=The%20impact%20of%20out%2Dmigration,and%20delays%20in%20insurance%20reimbursements).

[3] Elizabeth Trovall, *Filipino nurses fill critical jobs as workforce shortage intensifies*, Marketplace, Sept. 11, 2023, https://www.marketplace.org/2023/09/11/filipino-nurses-fill-critical-jobs-as-workforce-shortage-intensifies/ (last accessed March 8, 2024).

[4] *Id.* (citing Morales N., *Philippines raises cap on health professionals going abroad*. Reuters. 2021, available at https://www.reuters.com/world/asia-pacific/philippines-raises-cap-health-professionals-going-abroad-2021-06-18/ June 18, 2021( last accessed Feb. 20, 2024).

[5] *Id.*

2

manipulation, abuse of the legal process, and threats of severe financial harm in order to keep these nurses working for them and their clients.[6]

5.     Defendant Westways is one of these agencies, peddling in people. And its clients are buying. The facts set forth in this pleading tell a story that, although not new, has been suppressed by the very entities best-positioned to stop these practices.

6.     Plaintiffs are Filipino nurses, two of the thousands of nurses who immigrate to the United States each year, typically through one of numerous international staffing agencies.

7.     Plaintiffs, and others like them, were lured to the United States by Westways' promises of employment that would match their experience, further their careers, pay them well, and ultimately open the door to permanent residency in the United States.

8.     But once Plaintiffs left their jobs, their homes, and their families in the Philippines, relocated across the globe to the U.S., took all the tests and procured the necessary licenses, Westways changed the terms. It paid them significantly less than the agreed salary, and less than the prevailing wage as required by the contract and by law. It failed to properly calculate their overtime or otherwise pay them according to numerous applicable federal and state laws and regulations. It placed Plaintiffs in partner facilities different from those agreed to, in different areas of the country. It placed them in departments different than those agreed to, and for which Plaintiffs were unprepared and untrained. And, significantly, it refused to let them leave, by threatening them with crushing financial penalties and legal action should they fail to complete their assignments.

---

[6] Aurora Almendral, *A Hidden System of Exploitation Underpins US Hospitals' Employment of Foreign Nurses: Faced with an unprecedented staffing crisis, some hospitals are turning to a captive workforce*, Quartz, Oct. 2, 2023, available at https://qz.com/a-hidden-system-of-exploitation-underpins-us-hospitals-1850888315( last accessed Feb. 20, 2024).

3

9.      As a result of being labor trafficked, Plaintiffs and others like them have suffered financially, professionally, and emotionally. They relied on Westways' attractive offer, moved away from family, friends, and secured employment to pursue a promised opportunity. But once they arrived in the U.S., often with very little money, no support network, no understanding of the U.S. legal system or their rights, they were presented with an impossible choice: either take an assignment far different than the one promised or be obligated to pay Defendants many thousands of dollars, have their visa sponsorship revoked, and potentially be reported to collections and the IRS.

10.     Plaintiffs and others like them were thrust into positions where they either worked long hours or were not given enough hours to make ends meet, caring for numerous patients with needs they were unprepared to meet, in units they did not possess adequate training for, forced to serve in managerial roles they were not qualified to serve in, and all for a fraction of the pay they were promised— significantly less than the prevailing wage in their geographic location and the wages of other non-foreign born nurses performing the same jobs.

11.     Westways has been importing foreign-born nurses for decades using this scheme and exploiting them for labor at contracted facilities within partner health systems across the country.

12.     Westways' health system clients, such as Defendant UHS, agree to pay Westways for these nurses, who then work alongside the staff nurses they employ directly. Westways' clients' control and direct the scope of Plaintiffs' work, work orders, shifts, hours, procedures, protocols, charting, entering time, and more. These client-defendants have authority to interview, approve (or reject), permit vacation, discipline, and dismiss Plaintiffs. They mandate facility-specific trainings and compliance with facility protocols and practices. Despite knowing (or recklessly disregarding) the disparity in pay to Westways' foreign-born nurses, and despite

knowing (or recklessly disregarding) the onerous terms of the nurses' contracts, including liquidated damages and buyout provisions, UHS continues to engage with and benefit from its venture with Westways to procure nurses with whom it can staff its facilities and provide needed care to its patients.

13.    This is indentured servitude, a modern form of slavery in which individuals are kept and forced to continue laboring in positions through non-violent – but nevertheless effective – forms of coercion.[7]

14.    The civil remedy provision of the Trafficking Victims Protection Reauthorization Act ("TVPRA") was created precisely to provide individuals like Plaintiffs an avenue for confronting traffickers like Westways, who knowingly procured and obtained their labor by fraud, duress, coercion, and threat, and who exploit their vulnerabilities for its own benefit.

15.    The TVPRA further provides Plaintiffs a mechanism to hold accountable those health system entities who benefit from their arrangements with traffickers like Westways, who "knew" or "should know" or "recklessly disregard[ed]" that Plaintiffs were working under conditions that violated the TVPRA but turned a blind eye to this reality in order to continue receiving the benefit of their labor.

## **PARTIES**

16.    Plaintiff Tab Pacleb Wy is a Registered Nurse licensed to practice in the State of California. Tab remains under contract with Westways and was formerly employed at Corona Regional Medical Center, which is a Universal Health Services facility. Tab is a citizen of the Republic of the Philippines and a lawful permanent

---

[7] *See, e.g., Paguirigan v. Prompt Nursing Employment Agency LLC*, 2019 WL 4647648, at *1 (E.D.N.Y. Sept. 24, 2019) (following denial of defendants' motion to dismiss and certification of a class, granting summary judgment to plaintiff, a Filipino nurse, finding defendants violated TVPRA by engaging in and/or benefitting from a scheme that used threats of serious harm to keep Filipino nurses working for less than the prevailing wage).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

resident of the U.S., currently residing in Oxnard, California.

17. Plaintiff Josie Anne Ladua Leysa is a Registered Nurse licensed to practice in the State of California. Josie remains under contract with Westways and was formerly employed at Corona Regional Medical Center, which is a Universal Health Services facility. Josie is a citizen of the Republic of the Philippines and a lawful permanent resident of the U.S., currently residing in West Covina, California.

18. Defendant Westways Staffing Services, Inc. is a California Corporation with its headquarters or principal place of business located at 790 The City Drive S, Suite 180, Orange, California, 92868.

19. Defendant Universal Health Services is a Delaware Corporation with its headquarters or principal place of business located at 367 South Gulph Road, P.O. Box 61558, King of Prussia, Pennsylvania, 19406.

## **JURISDICTION AND VENUE**

20. This Court has federal question jurisdiction over this action under 28 U.S.C. § 1331 because this action alleges violations of federal statues, including the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1589, et seq.

21. This Court also has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a proposed class action in which: (1) there are at least 100 class members; (2) the combined claims of Class Members exceed $5,000,000.00, exclusive of interest, attorneys' fees, and costs; and (3) Defendant and at least one class member are citizens of different states, and/or are a citizen or subject of a foreign state, and at least one class member is a citizen of a state.

22. This Court has supplemental jurisdiction over any remaining claims under 28 U.S.C. § 1367 because these claims form part of the same case or controversy as the federal law claims.

23. This Court has personal jurisdiction over Defendant Westways because

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Westways is "at home" in California and because the claims of Plaintiffs and all others similarly situated arise from Westways' acts and omissions conducted from its headquarters in California.

24. This Court has personal jurisdiction over Defendant UHS because UHS owns and operates healthcare facilities within California, including Corona Regional Medical Center, located at 800 S Main Street, Corona, California 92882, and has purposefully availed itself of the privilege of conducting business within the state of California, where the conduct underlying these complaints primarily occurred.

25. Venue is proper in this District under 28 U.S.C. § 1391 because this is the District in which Defendant Westways resides and a substantial part of the conduct at issue in this case occurred in this District.

## COMMON ALLEGATIONS OF FACT

### A. Westways' Recruitment of Foreign Nurses

26. Founded by Harold Sterling in the 1990s, Westways holds itself out as one of the premier travel nursing agencies in the country. On its website, it claims to be "[a] Leader in Per Diem & Travel Nursing."[8]

27. As a U.S. Nurse Sponsor, Westways "sponsors hundreds of nurses from Asia, Africa, Middle East, and Europe who are excited by the prospect of a career in the United States."[9] Westways touts that "[t]ogether with our nurses, we have created a truly global nursing community that stretches far beyond our country's borders."[10]

28. Foreign nurses who are accepted into Westways' Immigrant Visa Sponsorship Program for RNs are assigned to Westways' client hospitals to "be employed in permanent and full-time positions."[11]

---

[8] Westways Staffing website, available at https://www.westwaysstaffing.com/ (last visited March 8, 2024).
[9] *Id.*
[10] https://www.westwaysstaffing.com/usa-nursing-program/ (last visited March 8, 2024) (internal citations omitted).
[11] https://www.westwaysstaffing.com/immigrant-visa-sponsorship-guidelines/ (last visited March 8, 2024).

7

29.    Westways recruits foreign nurses in a variety of ways. The Plaintiffs here were both referred to Westways by friends or family members; those Westways employees received a referral bonus when Plaintiffs were hired.

30.    Typically, as with Plaintiffs, Westways makes a foreign nurse a "bona fide offer of employment" or similarly-titled document in the form of a letter from its President and CEO, Harold Sterling (the "Offer").

31.    These Offers contain an offer of full-time and permanent employment as a Registered Nurse; they set forth a starting annual salary, a guaranteed minimum number of hours per week, a specific facility assignment, and a list of job duties.

32.    Once they've accepted Westways' Offer, foreign nurses must sign a contract of employment (the "Contract" or "Contract of Employment"), which again includes, among other things, their facility assignment—which is "based on training, competency, and work qualifications"—and their annual compensation—which is consistent with the prevailing wage for that locale. The Contract indicates employee's acceptance of employment for a period of set hours upon completion of training.

33.    Westways then undertakes the process of obtaining an employment visa for the foreign nurse by completing and filing the I-140 Immigrant Petition for Alien Worker with the United States Citizenship and Immigration Services ("USCIS").[12]

34.    After the I-140 petition is approved by USCIS and the nurse's immigrant visa priority date becomes current, the nurse may apply for the immigrant visa with the U.S. Embassy in his or her country of current residence through the National Visa Center (Form DS-260).[13]

35.    From start to finish, this process may take anywhere from six months to more than four years.[14] In some cases, Westways may require the foreign nurse to

---

[12] *Id.*
[13] *Id.*
[14] *Id.*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

sign a superseding or updated contract or Contracts of Employment, containing the same or similar terms but often increasing the promised salary, reflective of an increase to the prevailing wage of the geographic location specified in the contract. During this time, the nurses are beholden to Westways and subject to its binding contract.

36.    However, after a foreign nurse signs the contract(s) of employment and expends significant time, money, and resources to relocate to the U.S., Westways pulls a "bait-and-switch."

37.    After transporting its foreign nurses to the U.S., typically by arranging and paying for their air travel, Westways requires its foreign nurses to complete a two-week orientation in Dallas, Texas, for which it compensates them $20 per hour, which is less than the hourly rate promised in the Offer and Contract for Employment.

38.    Then, completely abandoning its promises to the foreign nurse, Westways makes a "take-it-or-leave-it" offer, demanding sign-on to a travel assignment agreement ("Travel Assignment Agreement") placing the nurse at a facility in a different geographical area, for wages significantly lower than required by the Contract of Employment and immigration laws.

39.    Foreign nurses, including Plaintiffs, are often assigned to departments that are severely understaffed and where they are required to perform functions for which they lack proper training and/or qualifications.

40.    Additionally, or alternatively, foreign nurses are not given permanent, full time employment; their assignment does not provide enough hours to make ends meet or they find themselves waiting, without work, for an assignment.

41.    Westways' Offer and Contracts are premised on false promises. Westways has no intention of paying foreign nurses the annual salary agreed to in their Contracts of Employment. Nor does it have any intention of assigning them to

9

the promised facilities—or to departments based on their training, competency, and work qualifications. Westways bets on the fact that, after a foreign nurse has spent years procuring an assignment—and taking all steps necessary to accept the assignment, such as receiving their Certificate from the Commission on Graduates of Foreign Nursing Schools (CGFNS); passing the National Council Licensure Examination for Registered Nurses (NCLEX-RN), giving up their current employment or other employment options, working through the work visa process including a consular interview, obtaining licensure in a state, leaving their home and moving to the U.S., typically with little to no money—that they are simply not able—economically or otherwise—to walk away from the new Travel Assignment Agreement.

42.    The tendency of foreign-born nurses to be less likely than domestic nurses to leave their employment has been noted in the media.[15] But Westways doubles down to ensure that no foreign nurse will leave its employ by incorporating a vague buyout provision in its Contract and an onerous early termination penalty in its Travel Assignment, discussed below.

43.    As a result of the "bait-and-switch" abuse of Westways' Immigrant Visa Sponsorship Program, Plaintiffs and other foreign born nurses are working at facilities different than agreed to in their Contracts of Employment, in different parts of the country, are being paid less than the prevailing wage for all of their hours of work relative to their position and location (discussed more fully below), are being

---

[15] Meghan McCarty Carino, *Foreign-born nurses may be less likely to walk away from their jobs*, Marketplace, Dec. 22, 2021, available at https://www.marketplace.org/2021/12/22/foreign-born-nurses-may-be-less-likely-to-walk-away-from-their-jobs/, last accessed March 8, 2024 (After noting that nearly "1 in 5 health care workers have quit their job during the pandemic," citing "[a] recent survey by a large health care staffing firm suggest[ing]" that "there's one group that may be less likely to quit – foreign-born nurses.") (citing O'Grady Peyton Int'l (USA) 2021 Survey of International Nurses, available at https://www.amnhealthcare.com/siteassets/amn-insights/whitepapers/2021-survey-of-international-nursing.pdf (last accessed March 8, 2024).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

paid in violation of applicable federal and state wage and hour laws and regulations, and are required to work in departments other than the departments they were promised, performing duties for which they may not be adequately trained or qualified.

44.    Plaintiffs are fearful of endangering patients and their own licenses but are equally fearful of Westways' crushing financial penalties and threats to report them to governmental authorities, more fully described below.

**B.    The Venture: Relationships among Westways, its Client Employers, and the Foreign-born Nurses they Employ.**

**1.    Westways and UHS Are Jointly Responsible to Ensure Foreign-Born Nurses are Paid in Compliance with the Law.**

45.    For purposes of all applicable federal and state labor laws, Westways and UHS are jointly and severally obligated to ensure that the Plaintiffs and others like them are paid in accord with the law.

46.    As a labor contractor under California law, Westways supplies UHS with workers like Plaintiffs to perform labor within UHS's facilities to care for patients, as part of the facilities' usual course of business and on the facilities' premises. Thus, all Defendants bear legal responsibility and are civilly liable for the proper payment of wages in accordance with the law.

47.    Although Plaintiffs signed employment contracts with Westways, on information and belief, Westways employs Plaintiffs and others similarly situated on behalf of or as an agent of UHS to staff UHS facilities pursuant to UHS and Westways' contract, in which:

a.    UHS authorizes Westways and Westways agrees to act as UHS's agent for the purpose of staffing UHS facilities with foreign nurses like Plaintiffs.

b.    UHS authorizes Westways and Westways agrees to

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

employ the foreign nurses like Plaintiffs that Westways staffs at UHS facilities.

c.     UHS controls and Westways agrees UHS may control the bill rate—the total amount UHS agrees to pay Westways for every hour worked at a UHS facility by a foreign nurse employed by Westways—and thus the compensation of Plaintiffs.

d.     UHS authorizes Westways and Westways agrees to pay foreign nurses like Plaintiffs for their work at UHS facilities.

e.     UHS maintains and Westways agrees that UHS maintains the ultimate authority to terminate or fire foreign nurses that Westways staffs at UHS facilities like Plaintiffs.

48.    Additionally, or alternatively, on information and belief, Westways along with its client health systems and facilities jointly employ Plaintiffs and other similarly-situated foreign nurses within the meaning of, inter alia, the Fair Labor Standards Act ("FLSA"), and other state laws and regulations. As a joint employer, UHS is responsible for ensuring that Plaintiffs are properly paid, and are jointly and severally liable for failure to pay properly. For example:

a.     UHS, as it does it with its own direct or contractual employees, controls and directs the performance of the work of such employees like Plaintiffs by controlling and directing their scope of work, work orders, shifts, hours, procedures, protocols, charting, entering time, and more. UHS's control over Plaintiffs' work is the same as its control over the work of its own direct contractual employees.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

b.    Each employee like Plaintiffs performs work that is within the usual course of UHS's business, as UHS directly employs the same types of employees who in fact work side-by-side with such employees. UHS makes no distinctions regarding its control and direction over the work of its nurses as opposed to Westways-contracted nurses, but treats them the same.

c.    On information and belief, the agreement between Westways and UHS authorizes UHS to exercise other indicia of employment related to travel nurses such as Plaintiffs. UHS had the ability to interview, approve or disapprove, dismiss, and/or terminate employees procured by Westways if they fail to comply with UHS's guidelines and protocols.

d.    UHS requires facility-specific training modules to be completed before employees like Plaintiffs can work at the facility, including training regarding compliance with that UHS's facility's protocols, logistics, and practices, and Plaintiffs were expected to abide by UHS's protocols, logistics, and practices.

e.    Although their contracts were with Westways, Plaintiffs were dependent on UHS as a matter of economic reality for their primary employment, typically working 36-hours per week or more at UHS facilities, subject to UHS's direction, supervision, and control.

f.    Corona and UHS supervise the work schedules, conditions of employment, and the manner in which Plaintiffs and

other similarly situated employees perform their jobs, including whether and when they can take vacation or leave; and

    g.    Corona and UHS maintain employment records for Plaintiffs and other similarly situated employees.

49.    UHS benefits, financially and by receiving other value—including the value of the labor performed by Plaintiffs and other similarly situated workers—from their relationship with Westways and the foreign nurses it supplies them.

### 2. Westways' Relationship with its Client Employers, like UHS, is one of contract and/or agency.

50.    The relationships between and among Westways and its client health systems and facilities are governed by written agreements, under which Westways agrees to supply and staff its client-facilities with nurses. The specific terms of the contract between Westways and UHS are in the exclusive control of Defendants and are unavailable to Plaintiffs, who are not a party to such contracts and thus make certain allegations on information and belief.

51.    Among other things, the parties to these agreements typically commit and warrant that services provided under the agreements shall fully comply with all applicable federal, state, and local statutes, laws, rules and regulations.

52.    Among other things, the parties to these agreements typically warrant and represent compliance with federal and state labor and employment laws specifically those regarding child labor, procuring commercial sex, using forced labor and human trafficking, and specifically acknowledge and warrant commitment to anti-trafficking and related social accountability guidelines.

53.    Healthcare facilities like UHS's Corona, in need of nurses to fill temporary positions, offer staffing agencies like Westways a "bill rate" which is a total amount the facility is willing to pay the staffing agency for every hour worked

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

by a foreign travel nurse. The staffing agency then deducts costs, overhead, and profit margin from the bill rate and pays its nurses the difference.

54. Even in the unlikely event that UHS did not know the exact rate that Westways was paying Plaintiffs and other foreign-born nurses, or what Westways' target profit margin was, UHS knew what *it* was paying Westways, and should have known, based on its "bill rate" and foreseeable deductions, that the Plaintiffs were being paid less than the prevailing wage, inconsistent with their agreements and with state and federal requirements.

55. For its part, Westways contracts with healthcare facilities to staff open positions, and agrees to provide licensed healthcare personnel to staff its clients' facilities for periods of defined duration.

56. To fill these roles, Westways advertises attractive pay packages for assignments in the United States intended to entice foreign registered nurses to sign on as an employee of Westways and commit to a fixed-term assignment (typically two years).

57. Westways employs a team of "recruiters" whose job is to sell potential nurses on accepting a position and then to serve as the primary point of contact between the foreign-born nurse and agency. Plaintiffs here were assigned the same Westways recruiter, Khaleel Alasad. Most of their communications regarding assignments were through Alasad.

58. Westways then supplies these nurses to its health system or facility clients, such as UHS, to perform labor as nurses to staff its facility and care for its patients, on facility premises, which is part of the regular and customary work that facilities such as UHS's Corona facility performs.

59. Westways' pervasive fraud enables it to compete effectively—albeit unfairly—in the healthcare staffing marketplace. For example, when Westways must compete with other staffing agencies to fill a travel position, it advertises higher pay

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

packages that are more likely to entice foreign nurses, knowing that it does not intend to pay that amount after the nurses arrive in the U.S. and get placed at a facility. This practice has the perverse effect of not only harming nurses like Plaintiffs, but it harms competition in the United States nursing market: the practice locks up talented foreign-born nurses for an ostensibly competitive rate, denying Westways' competitors from that talent, but then coercing those nurses into continuing to work for less pay and in different locations than promised.

**C.    Westways Uses Unlawful Means – Including Threats of Serious Harm and the Abuse of Legal Process – to Prevent Foreign Nurses from Leaving Employment.**

60.    To compel foreign nurses to keep working for Defendants at a fraction of the prevailing wage rate under conditions different than those originally promised, Westways' form Contracts of Employment contain a harsh monetary penalty, which the contract refers to as a "buyout calculation" under the Compensatory Damages for Employer provision. Under the provision, foreign nurses must pay a penalty if they stop working for Defendants before the contract term ends.

61.    Likewise, the Travel Assignment Agreement—which foreign nurses are coerced to sign after they have arrived in the U.S. and are at Westways' mercy, desperate to work and awaiting an assignment—purports to impose a $13,000 early termination contract penalty if the foreign nurse voluntarily resigns from the assignment (including transferring to another facility) before the two-year contract term ends.

62.    Westways' terms constitute threats of serious harm. By using the language detailed below in its contracts and agreements, Westways has engaged in a deliberate scheme, pattern and plan intended to cause Plaintiffs and other similarly situated foreign nurses to believe that they would suffer serious harm if they terminated their employment with Westways or voluntarily resigned from their

assignment (including transferring to another facility or working for another facility) before the end of the contract term.

63.     Westways' form Contract of Employment for foreign nurses provides that, among other things, if the employee "at any time and for any reason fails to complete the term of full-time employment as a professional nurse, Employee is responsible to refund Employer all costs, including reasonable referral fees and all immigration fees, in the recruiting and placing of Employee." Further, the Contract provides that "the Employee's voluntary termination prior to the end of the contract term shall be the Employer's contract buyout calculation, which is defined as the remaining Employer gross profit due on the Employee's contract plus any other unpaid referral, immigration, training, housing, and reimbursement charges owed by Employee."

64.     Additionally, the Westways' Travel Assignment Agreement, which is presented after Westways has transported the foreign nurse to the U.S., provides that, among other things, "[e]mployee may be terminated from Assignment by Westways for cause, when notified by the Hospital. A penalty in the amount of $13,000 may be imposed if the contract is terminated early for cause. This includes, but is not limited to, voluntary resignation from assignment by employee and/or termination of the contract by facility."

65.     Such liquidated damages provisions have been found to constitute threats of serious harm violating the TVPRA. *See Paguirigan v. Prompt Nursing Employment Agency LLC*, 286 F. Supp. 3d 430, 438 (E.D.N.Y. 2017) (declining to dismiss claims of plaintiff, a Filippino nurse,  finding that $25,000 liquidated damages provision threatened serious harm under the TVPRA); *Nunag–Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 790 F. Supp. 2d 1134, 1144 (C.D. Cal. 2011) (denying dismissal where defendants' purported saddling of Filipino nationals with $5,000 in debt, with threat that $10,000 more would be required for them to 'walk away,'

sufficient to constitute threat of serious harm under TVPRA).

66.    Letter Agreements that Westways enters into with its foreign nurses once they've arrived in the U.S. note that Westways "will require the Petitioned Nurse to reimburse the Company for these costs, in the event that the Petitioned Nurse fails to honor his/her obligations under the I-140 Petition or the Petitioned Nurse fails to work at least 2 years (3,744 hours) for the Company." Even if the nurse completes the required hours of service, the agreement obligates the nurse to reimburse Westways for application costs for derivative beneficiaries through purportedly preauthorized paycheck deductions.

67.    The Contracts of Employment signed by Plaintiffs prior to their move to the U.S. did not disclose the amount of the buyout penalty nor did it describe how Westways enforces it. The contracts' general language does not provide any indication of what the actual cost of "buying out" might be, nor would it put a reasonable person with the characteristics of Plaintiffs and other foreign-born nurses on notice that, under this contract, resignation could require them to pay, out of pocket, more than the annual salary that Westways would actually be paying them. It is only after the foreign nurses are brought to the U.S., sign their letter and Travel Assignment Agreements, and begin working for Defendants that they become aware of the punitive and coercive nature of Westways' buyout and early termination penalties, as Plaintiffs did.

## **PLAINTIFFS' FACTUAL ALLEGATIONS**

### **A.    Westways' Recruitment and Hiring of Plaintiff Tab Wy**

68.    Plaintiff Tab Wy is an experienced RN. Tab worked as a medical surgical nurse for four years in the Philippines prior to immigrating to the U.S.

69.    Like many foreign nurses, Tab wanted to come to the U.S. for better career opportunities, and to provide better income and security for family members back in the Philippines, and to make a better life here. Lured by that possibility, Tab

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

was introduced to Westways in February 2020 after learning about the staffing agency during a trip to California to visit family.

70.    Prior to beginning the immigration process, on May 21, 2020, Westways made Tab a "bona fide offer of employment" through a letter signed by its President and CEO, Harold Sterling (the "Offer").

71.    The Offer contained an offer of full-time and permanent employment for no less than two years as a Registered Nurse; it set forth a starting annual salary, a guaranteed minimum number of hours per week, a specific facility assignment, and a list of specific job duties Tab would be expected to perform.

72.    Also on May 21, 2020, Tab signed Westways' form contract of employment ("the 2020 Contract"), which was consistent with the Offer.

73.    Per the 2020 Contract, the parties agreed that once Tab received a green card and/or work permit, Tab would work for Westways for a period of 3,744 hours (equivalent to two years) as a Staff Nurse at the Nebraska Department of Correctional Services, located at 3220 W Van Dorn St, Lincoln, NE 68522, for an annual salary of $53,290.00—the 2019/2020 prevailing wage for a RN in Lancaster County, Nebraska.

74.    On or about March 29, 2022, as the visa process was at or near completion, Westways presented Tab an updated contract of employment ("the 2022 Contract").

75.    The 2022 Contract reiterated the offer of employment and increased Tab's annual salary to $55,578.00 ($26.72 per hour)—the 2021/2022 prevailing wage in Lancaster County, Nebraska for a RN.

76.    Although Tab had never been to Nebraska, Tab was interested in serving as a nurse in a corrections facility.

77.    The form contracts signed by the named Plaintiffs here are not materially different. And upon information and belief, the terms in the Contracts of

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Employment for foreign nurses recruited through Westways' Immigrant Visa Sponsorship program are substantially similar, except for differing details on promised annual salary and facility location.

78. Westways typically flies its foreign nurses to Dallas, Texas, for a two-week orientation program with Global Essential Services, LLC ("GES"). This orientation is to expose the nurses to some of the equipment they will see in U.S. hospitals. The foreign nurses arrive with very little to no money and are paid $20 per hour for their time in training.

79. Westways arranged and paid for Tab's flight to the United States and provided housing for Tab and other recruits at a hotel in Dallas, Texas.

80. Westways planned for Tab to arrive in the U.S. on August 3, even though it knew that an orientation session had already begun, and a new one would not begin for another two weeks.

81. Tab arrived in the U.S. on August 3, 2022, but did not begin orientation until August 16, 2022.

82. Tab attended orientation from August 16 to August 26, 2022. After completing orientation, Tab waited in limbo until October 13, 2022, in Dallas, Texas, before being presented with a placement.

**B.    Westways' Recruitment and Hiring of Plaintiff Josie Leysa**

83. Plaintiff Josie Leysa is an experienced RN. Josie worked as a cardiac technician, medical ward staff nurse, and dialysis trainee for a total of four years in the Philippines prior to immigrating to the U.S.

84. Like Tab, Josie was introduced to Westways in July 2019, and believed a career in nursing abroad would permit a better life for her and her family.

85. Prior to beginning the immigration process, on July 19, 2020, Westways made Josie a "bona fide offer of employment" through a letter signed by its President and CEO, Harold Sterling (the "Offer").

86.    The Offer contained an offer of full-time and permanent employment for no less than two years as a Registered Nurse; it set forth a starting annual salary, a guaranteed minimum number of hours per week, a specific facility assignment, and a list of specific job duties Josie would be expected to perform.

87.    Also on July 19, 2019, Josie signed Westways' form contract of employment ("the 2019 Contract"), which was consistent with the Offer.

88.    Per the 2019 Contract, the parties agreed that once she received her green card and/or work permit, Josie would work 3,744 hours (equivalent to two years) for Westways as an RN at Mountain Vista Medical Center, located at 1301 S Crismon Rd, Mesa, AZ 85209 for an annual salary of $58,240.00—the 2018/2019 prevailing wage for RN in Maricopa County, Arizona.

89.    On or about July 15, 2022, as the visa process was at or near completion, Westways presented Josie with updated employment contract ("the 2022 Contract").

90.    The 2022 Contract reiterated the employment terms and increased Josie's annual salary to $65,083.00 ($34.47 per hour)—the 2022/2023 prevailing wage for RN in Maricopa County, Arizona.

91.    Josie arrived in the U.S. on September 2, 2022, landing in California to stay with family until she flew to the GES Dallas Skills Lab in Dallas, Texas, where she began orientation on September 6, 2022. Josie was able to begin orientation soon after her arrival in Dallas and attended orientation from September 6 to September 16, 2022.

92.    Westways arranged and paid for Josie's flight to the United States and provided housing for Josie and other recruits at a hotel in Dallas, Texas. This was the first time Josie had visited the United States.

93.    Although Plaintiffs are proficient in English, it is not the first language of either Plaintiff; the first language of both Plaintiffs is Tagalog.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**C.      Westways Presents Work Placements with Materially Different Terms**

94.      For weeks, Plaintiffs requested updates from Westways on their work assignments.

95.      On October 13, 2022, Plaintiffs were separately presented with "travel assignment agreements" placing them both at Corona Regional Medical Center, located at 800 S Main St, Corona, California 92882 ("Corona") for a two-year term in the "MS Sub-Acute" department from October 26, 2022 to October 26, 2024.

96.      Corona Regional Medical Center is part of the Southwest Healthcare system. All of the hospitals in the Southwest Healthcare system are owned and operated by Defendant Universal Health Services, Inc.

97.      Although they had signed Contracts of Employment, had obtained visa approval, had relocated halfway around the world, had completed orientation, and had contractually agreed-upon expectations about the location and terms of their employment, Westways required Plaintiffs to sign these agreements to accept their placements and actually start working.

98.      Plaintiffs were surprised and confused by the terms of the Travel Assignment Agreements and did not fully understand the concept of travel nursing. However, Plaintiffs were eager to start working and believed that signing these agreements was their only option.

99.      These agreements were not consistent with the Offers or Contracts of Employment the Plaintiffs had signed in the Philippines. Not only were they located in a different state, at a different facility, and within a different department, these agreements included, among other things:

            a.  annual salaries significantly lower than promised in their
                Contracts of Employment and the prevailing wage;

            b.  a stipend or "allowance" for meals and incidentals;

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

     c. a minimum-hour requirement of 36 hours per week but no guaranteed hours; and

     d. an early termination penalty of $13,000.

100.   Here is a snapshot of the first page of the Travel Assignment Agreement Josie was required to sign while she was in Dallas waiting for work.



**Travel Assignment Agreement**

| Traveler Name: | Ma Josie Anne Leysa |
| --- | --- |

Thank you for choosing Westways Staffing Services, Inc. for your upcoming assignment. This agreement is pursuant to the following terms and conditions. Please do not hesitate to contact your recruiter if you have any questions, concerns or need anything clarified.

By signing this contract, you are agreeing to work as a healthcare professional for Westways pursuant to the following terms and attest that there is no conflict of interest between yourself (Traveler), Westways (Agency), and/or the Hospital (Client). Should you become aware of any potential conflict, you will contact your recruiter immediately to discuss any possible risks and liabilities. This agreement is considered valid once signed by you and a reciprocal work order from the client has been received. You will become an employee of Westways on the first day of your assignment with the client and remain an employee until the last day of the assignment unless future contract arrangements have been made.

Notwithstanding any previous language, nothing contained in this agreement shall change your status as an at-will employee of Westways. As such, you acknowledge and agree that Westways retains the discretion to terminate your employment at the end of the assignment or at any time and for any reason, including, but not limited to the termination of your assignment by the client.

**Assignment Details:**

| Client Facility: | Corona Regional Medical Center | Assignment Dates: | 10/26/2022 - 10/26/2024 |
| --- | --- | --- | --- |
| Facility Contact: | Unit Manager | Approved Time Off: | None |
| Facility Address: | 800 S Main St, Corona, CA 92882, United States | Department/Unit(s): | MS - Sub Acute |
| Facility Phone Number: | +19517374343 | Shift(s): | TBD |
| Special Comments: | - The facility will provide 8 weeks hospital orientation that includes EMR training to each RN. This may be extended if mutually agreed upon depending on each individual RN skills level. Orientation pay will continue if this occurs . <br><br> - The pay rate during the orientation was $20/hour ( Non-Taxable ) | | |

**Compensation:**

| | | |
| --- | --- | --- |
| Regular Hourly Rate: | 18 | |
| Overtime Premium Rate: | 27 | 1.5 x the Regular Rate for hours 8 through 12 in one day. |
| Double Time Rate: | 36 | 2.0 x the Regular Rate for hours worked over 12 in one day. |
| Total Taxable per 12-hour shift: | 252 | |
| On Call Rate: | 0 | |
| Call Back Rate: | 0 | |

**Work Schedule:**

| | |
| --- | --- |
| Minimum Required Hours | 36 hours weekly or three 12-hour shifts. |

**Benefits:**

| | | |
| --- | --- | --- |
| Allowance Including M&I | 1074.24 | paid weekly over 0 weeks beginning _____. |
| Allowance Add On: | 358.08 | For additional shifts (see work schedule above). |
| Missed Shift Charges (MSC): | -358.08 | when you do not work the expected number of shifts. |
| Health and Dental Insurance: | See details on page two under insurance. | |

| Guaranteed Hours Per Week: | 0 |
| --- | --- |
| Facility Cancellation Policy: | The Hospital may only cancel three 12-hour shifts under the minimum guaranteed hours per week during the contract period. |

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

101.    Both Plaintiffs' Travel Assignment Agreements placed them at Corona Regional Medical Center, a facility owned and operated by Universal Health Services in Corona, California, from October 26, 2022, to October 26, 2024, for a salary of only $18.00 per hour, with a daily overtime premium rate of $27 per hour for hours 8-12, and a double overtime rate of $36 per hour for hours worked over 12 in a day. Plaintiffs also received a stipend "allowance," which included meals & incidentals ("M&I") of $1,074.24 per week, and an "allowance add on" of $358.08 for additional shifts worked.

102.    Assuming Plaintiffs worked their assigned 36-hours per week[16] each and every week for an entire year, their approximate annual wages would be $39,312.

103.    At the time Plaintiffs began working for Corona, the prevailing wage for a RN in Riverside, California was $80,579.00. The prevailing wage went up to $90,022 in July 2023. Westways paid Plaintiffs significantly less than the legally required prevailing wage.

104.    Plaintiffs were routinely expected to, and in fact often did work on a full-time basis, but were not properly compensated at the correct prevailing wage rate for all their hours of work.

105.    Westways likewise employed other foreign nurses similarly situated to Plaintiffs, who also were not properly compensated the correct prevailing wage rates for all of their hours of work relative to their position and location as determined by the DOL.

106.    Moreover, it was not until after Plaintiffs moved to Corona, California, and began working at Corona that they understood their placement in the MS Sub-Acute department was not what they expected when they had agreed to work as staff

---

[16] Based on California overtime laws, Plaintiffs would be paid $18.00 for the first 24-hours worked each week and $27 for the additional 12-hours worked each week due to the fact that they work three 12-hour shifts weekly. See Cal. Lab. Code § 510(a).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

nurses in the Long-Term Acute Care department they were promised. MS Sub-Acute generally entails a longer stay for patients but requires more intensive care; it is a department that neither Plaintiff was experienced in or trained for.

107.   The Travel Assignment Agreements state that "the facility will provide 8 weeks hospital orientation that includes EMR training to each RN. And, that the training may be extended if mutually agreed upon depending on each individual RN's skills level."

108.   Plaintiffs were promised that they would receive additional orientation and training at the facility and that they would be treated as new graduates since they were unfamiliar with the department to which they were assigned.

109.   Plaintiffs did not receive the full eight weeks of training and felt unprepared and unqualified for their placement in the MS Sub-Acute department. During this incomplete training period, Plaintiffs were paid $20 per hour.

110.   Rather than provide the promised training, Defendants required that Plaintiffs serve in the role of "charge nurse" within months of their shortened orientation ending.

111.   The "charge nurse" position literally placed Plaintiffs in charge: the role is responsible for all the patients on the floor—in Corona's MS Sub-Acute department this meant as many as 20 patients or more; the charge nurse is responsible for discussing issues with the doctors and for making decisions about whether a patient should be transferred to a different department.

112.   Neither Plaintiff felt adequately prepared to work as a new nurse in the MS Sub-Acute department at Corona, let alone serve in a managerial role as a charge nurse, with no additional oversight or orientation related to the role.

**D.   Westways Threatens Plaintiffs with Serious Harm if they Leave Westways' Employ.**

113.   As months went by, Plaintiffs began to deteriorate working under these

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

conditions, but they learned that they were trapped: Westways ultimately communicated to both Plaintiffs that if they wanted to buy themselves out of their contracts, it would cost them over $40,000, as described in more detail herein.

114. Independently, in the fall of 2023, both Plaintiffs requested two weeks of leave to go home. Leave was approved for Tab, but not for Josie, who was terminated by Corona. When each of the Plaintiffs returned from the Philippines, Westways provided no placement for them.

115. In fact, despite repeated requests for assignments that would fit their experience, both during their leave abroad and once they arrived back in the U.S., Westways failed to provide either Plaintiff a full-time placement or additional training.

116. Needing full-time work, both Plaintiffs obtained other employment, and although their new roles are a better match for their skills, experience, and interest, they are now even more fearful of Westways.

117. On information and belief, Westways has sued to enforce its contract terms. *See Westways Staffing Services, Inc. v. Louise Cordero*, No. SCISS85059 (Cal. Super. Apr. 16, 2002) (entering default judgment of $22,450.13); *Westways Staffing Services, Inc. v. Sonoma West Med. Ctr.*, No. BS172152, 2018 WL 1370504 (Cal. Super. Jan. 25, 2018) (seeking confirmation of arbitration award to judgment in amount of $498,567.51 against respondent health facility for nonpayment of bill rate).

**1.      Westways Threatens Significant Financial Harm, Demanding $40,000+ for Plaintiffs to "Buy Out" their Contracts.**

118. After months of feeling undertrained to provide adequate medical care in the Sub Acute department at Corona, Plaintiff Tab Wy asked Khaleel Alasad and Hesham Alsayyed, with Westways, about the possibility of transferring to another

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

department or facility. Tab was told that six months of work in the current department (Sub Acute) at the assigned facility (Corona) must be completed before it would be possible to transfer.

119. After Tab completed the six months as instructed, Tab again asked Alasad and Alsayyed if he could be transferred to another department or facility. Tab was then told that he must complete a full year of work before he could transfer.

120. Still feeling undertrained and ill-equipped, worried about his patients and his license, and distressed about the lack of options, Tab inquired on or about March 22, 2023, about terminating his contract with Westways.

121. Khaleel, the Westways recruiter, emailed Tab a buyout calculation totaling $44,166.15 that Tab would have to pay in order to leave Westways. The calculation detailed the following line items: (1) contract buyout $24,711.52; (2) housing bonus $4,822.08; immigration expense $3,381.35; (3) reimbursement $1,743.97; and 4) training $9,507.22. This buyout figure represents 112% of the annual salary Tab would actually have been paid at Corona under the Travel Assignment Agreement if he worked 36 hours a week every week for a year.

122. Similarly, after Josie's unapproved leave from Corona and Westways' unwillingness or inability to find her a placement, Westways asked Josie if she intended to buy out her contract. When she inquired what that might cost, she was told it would cost around $40,000.

123. Westways' penalty provisions are unduly punitive, manifestly unreasonable, and wholly disproportionate to the compensation paid to the foreign nurses. Westways sets its penalty amounts with the goal of coercing foreign nurses through the threat of substantial financial harm to continue working for Defendants. The liquidated damages provision alone constitutes a violation of the TVPRA as a coercive threat of harm designed to compel, under the circumstances, foreign-born nurses to remain in their jobs.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

124.   The purpose of the buyout and liquidated damages provisions are not to compensate Westways for actual or potential damages. Their purpose is to coerce foreign nurses' labor and services for Westways and its clients through threats of financial harm, and to prevent foreign nurses from leaving their employment with Defendants.

**2.    Westways Threatens to Terminate Visa Sponsorship, Report to Governmental Authorities and Credit Reporting Agencies, and to Pursue Legal Action with "Loser Pays" Provision.**

125.   Westways' Contract of Employment and Travel Assignment Agreement for foreign nurses contain draconian terms designed to keep foreign nurses working for Westways and its clients, including an express, written threat to request immediate termination of I-140 petitions for foreign nurses who, among other things, terminate their employment after commencing work.

126.   Specifically, under the Termination of I-140 Petition provision in its Contract, Westways states "Employer may request immediate termination of I-140 petition for Employee" in the event of "refusal of Employee to work for Employer after commencement of Employment" or "Determination by Employer that Employee is working for another employer whose interests are adverse to those of Employer."[17] These provisions clearly imply that failure to remain employed with Westways may result in negative immigration consequences.

127.   Moreover, Westways' communications with foreign nurses also suggest and are designed to suggest that there would be credit and tax-related consequences for foreign nurses who leave employment before the end of their contract period. For example, as discussed above, on or about March 22, 2023, Plaintiff Tab Wy received an email response to his request to terminate employment with Westways. In that

---

[17] *See* 2022 Contract, Section 1.06.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

email, Westways threatened that if Tab terminated the Contract of Employment, Tab would be required to settle his account upon receipt of his contract buyout letter. Westways further threatened that if Plaintiff failed to settle the account or contact Westways within ten (10) calendar days from the date of the letter, Westways would be left with "no choice but to refer [his] account to [its] corporate collection agency, in which case [he] will be reported to the major credit reporting agencies. [Westways] may also report this to the I.R.S. as Debt Cancellation Income under I.R.S. Reg. S1.61-12 if payment is not received."

128. When Tab's recruiter informed Tab that the buyout amount was $44,166.15, and Tab asked for some time to make a decision, the recruiter assured Tab that they would "not send it to a collection agency till we receive a final confirmation from you [that you want to proceed with buyout]." This communication was followed by a smiley-face emoji. Westways recruiters have likely sent hundreds of similar communications to other nurses like Plaintiffs, knowing that, under the circumstances, no foreign-born nurse would be able to buy themselves out of their contract and would have to continue working for Defendants, no matter how difficult, discouraging, incompatible, or underpaid their placement was.

129. Westways' Letter Agreement notes that in the event of a breach, Westways "shall file a complaint with the appropriate court in California to enforce the obligations under this Letter-Agreement." And Westways' form Contract of Employment states that: "Should any litigation be commenced between the parties to this contract concerning the subject matter of the agreement, or the rights and duties of either in relation thereto, the party prevailing in that litigation shall be entitled, in addition to any other relief granted, to a reasonable sum as and for attorney's fees which shall be determined by the court in that litigation or in a separate action brought for that purpose." This type of "loser pays" provision creates

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

a chilling effect on employees exercising their statutory rights that is unconscionable under California law, and which has been found to violate the TVPRA as well as various state laws and held unenforceable.

130.  Westways' threats to terminate visa sponsorship, report foreign nurses to governmental authorities and credit reporting agencies, and to initiate litigation – purportedly on a "loser pays" basis – constitute conditions of servitude induced through abuse of the legal process and are made: (1) for the purpose of coercing foreign nurses to continue working for Defendants; and (2) with the intent to cause foreign nurses to believe that they would suffer serious financial harm and immigration consequences if they do not continue working for Defendants.

131.  Although the form Contract suggests that "[t]his agreement was drafted by both parties and shall not be construed against either,"[18] this statement is as disingenuous as it is self-serving. Foreign-born nurses seeking employment abroad do not negotiate with Westways or assist in the drafting of its agreements, which are form agreements common across the victims it recruits.

**E.    UHS Knows or Should Know that Westways is Recruiting or Obtaining the Labor of Plaintiffs and Other Foreign Nurses in Violation of the Law.**

132.  The economic dynamics of recruiting labor in a highly competitive and volatile labor market creates potential ethical dilemmas for the institutions navigating their staffing needs. But at every turn, health systems have sided with protecting themselves over protecting the healthcare personnel who care for their patients. This is particularly true as to vulnerable foreign-born healthcare workers supplied by staffing agencies.

133.  As set forth in detail throughout this Complaint and at all relevant times, Defendants knew or should have known of the endemic problem of forced labor in

---

[18] *Id.*, Section 8.10

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

the health care industry and with the employment of foreign nurses in particular, which led Defendants to adopt policies, impose trainings and certifications, and institute special procedures for reporting, investigating, and responding to complaints of trafficking; and which, on information and belief, led Defendants to obtain insurance covering damage or injury because of abuse, molestation or exploitation arising from negligent employment, training, investigation, reporting or failure to report, or retention or supervision of a person for whom that Defendant is or was legally responsible.

134.   Defendants' ostensible commitment to anti-trafficking—often recited in the contracts between the facility and the staffing agency—is a slap in the face to Plaintiffs and those like them, who are actively being labor trafficked by staffing agencies like Westways while its client health systems like UHS turn a blind eye and continue to benefit from their labor—all while purporting to give themselves plausible deniability in their contracts with each other.

135.   Westways' actions were committed to fulfill their contractual staffing obligations to UHS.

136.   Westways' recruitment and UHS's shared or joint employment of foreign-born nurses under conditions in which they are laboring under threats of significant harm constitute a venture that violates the TVPRA. Westways knew, and UHS knew or should have known, of the conditions under which Plaintiffs and other foreign-born nurses are providing labor for them and caring for their patients.

137.   Specifically, as a client employer, joint employer, or due to an agency relationship, UHS and other health systems have an obligation to ensure that the foreign nurses supplied by staffing agencies and laboring in their facilities are being paid in accord with the law. This includes an obligation to know how much these nurses are being paid and under what conditions these nurses are working.

138.   Instead, Defendants recruit foreign nurses precisely because they can

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1  exploit their labor.

2      139.   UHS and Westways engage in a pattern and practice of discriminating

3  against foreign born nurses.

4      140.   Specifically, Westways requires its foreign nurses to sign Travel

5  Assignment Agreements that are materially different than Travel Assignment

6  Agreements for non-foreign nurses in the following ways:

7            a.    Non-foreign nurses are provided a "guaranteed" number

8                  of hours they will be scheduled and/or paid for per week,

9                  while foreign nurses are "guaranteed" zero hours per

10                 week.

11           b.    Foreign nurses are bound to two-year Travel Assignment

12                 Agreements, while non-foreign nurses sign for

13                 significantly shorter terms, typically only 13-weeks.

14           c.    Foreign nurses are subject to a $13,000 early termination

15                 penalty if they choose to terminate their Travel

16                 Assignment Agreement prior to the end of their contract

17                 term, while non-foreign nurses are only subject to a $1,000

18                 penalty.

19           d.    Non-foreign nurses are paid a premium for choosing to be

20                 a travel nurse, while foreign nurses do not receive a

21                 premium and are coerced into being "travel nurses."

22      141.   Defendants also engage in a pattern and practice of denying foreign

23  nurses access to the online scheduling services that domestic nurses have access to

24  at their facilities. This results in foreign nurses like Plaintiffs being forced to work

25  because they don't have access to scheduling, and being the first to get "canceled"

26  if temporary staffing is not needed.

27      142.   Moreover, Defendants routinely place foreign nurses in undesirable

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

nursing departments, forcing them to perform functions without proper training and/or qualifications.

143.    Additionally, upon information and belief, Defendants pay foreign nurses less than their non-foreign counterparts. And most critically, as explained in detail above, unlike their non-foreign counterparts, foreign nurses are subject to liquidated damages, a buyout penalty, and threats of litigation and immigration consequences if they stop working for Defendants before their contract term ends.

144.    UHS culpably assists or furthers the venture through its continued business relationship with Westways.

145.    For its own benefit, UHS continues to engage with Westways to hire and employ its imported nurses, despite numerous red flags, including that UHS knows its bill rate for foreign nurses is significantly less than that for other (domestic) nurses; that its foreign nurses do not have access to the same scheduling tools or internal resources as similarly-situated domestic nurses; that its foreign travel nurses were brought to the U.S. by Westways, are oftentimes housed by Westways, are being provided to UHS by Westways, and are otherwise subject to the control of both UHS and Westways. Moreover, UHS knows or should know, based on recent publications in the media and by governmental agencies—and potentially as recognized in anti-trafficking provisions in its own contracts—forced labor and trafficking, particularly of Filipino nurses, are a significant problem in the industry.

**F.    Plaintiffs and Those Similarly Situated Have Suffered Significant Harm, Financially and Otherwise, As a Result of Defendants' Conduct.**

146.    Because Westways' foreign-born nurses are a captive workforce, Defendants can and do engage in violations of numerous federal and state labor codes with apparent impunity: Plaintiffs and other similarly situated employees are victims of uniform and unlawful compensation policies and have suffered

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

considerable damages as a result of Defendants' bait and switch practices, non-payment or underpayment of training time, failure to pay the prevailing wage, failure to properly calculate the regular rate for purposes of paying overtime and other financial harm.

147. Plaintiffs trusted Westways and its promises for a better life. But Westways betrayed them. UHS normalized and tacitly condoned Westways' conduct by turning a blind eye to its exploitative tactics, despite its obligations as a joint employer to ensure otherwise. In addition to the measurable financial harm caused by Defendants' violations of multiple federal and state laws, many of which carry liquidated damages and additional penalties, Plaintiffs have suffered emotionally as a result of their experiences with Defendants.

148. Trafficking, forced labor, forced services, and other violations of human rights are deeply traumatic crimes that can cause severe damages to survivors' physical, emotional, spiritual and psychological well-being.[19]

149. Tab feared that understaffing in the MS Sub-Acute unit at Corona put him at risk of making a serious error. For the first time, Tab developed anxiety.

150. Josie had a similar experience: since coming to the U.S. and working for Westways, Josie has not been able to rest well.

151. Josie and Tab both feared and still fear the Westways contract that looms over their heads, and both fear that at any time Westways might reach out to immigration authorities, initiate litigation, or enforce its onerous buyout or liquidated damages provisions.

152. Both Tab and Josie have expressed and continue to express a desire to be able to work per diems for Westways in order to lessen the hours left in their

---

[19] United States Department of Justice, Office of Justice Programs, Project Trust in partnership with Office for Victims of Crime – Human Trafficking Capacity Building Center, *Understanding Trauma*, available at https://htcbc.ovc.ojp.gov/sites/g/files/xyckuh311/files/media/document/Understanding_Trauma_508c.pdf (last accessed March 8, 2024).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

contracts, which they cannot afford to buy out at the outrageous price Westways has set.

153.   As a direct and proximate result of the actions and inactions of Defendants, Plaintiffs have suffered severe emotional distress, ascertainable psychological and physical injuries, economic losses for their unpaid and underpaid labor and caused by unemployment or loss of employment or loss of business opportunities, and these injuries continue.

154.   Plaintiffs claim damages—economic and otherwise—in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## CLASS ACTION ALLEGATIONS

155.   Class Definitions: Plaintiffs bring this action individually and on behalf of all other similarly situated individuals. Pursuant to Federal Rules of Civil Procedure 23(b)(3), 23(b)(2), and/or 23(c)(4), Plaintiffs seeks certification of classes consisting of:

The TVPRA Class: All foreign-born healthcare workers who entered into an agreement with Westways to relocate to the United States for work and who performed work for either Defendant within the United States.

The CTVPA Subclass: All foreign-born healthcare workers who entered into an agreement with Westways to relocate to the United States for work and who performed work for either Defendant within the State of California.

156.   Excluded from the Class are the Court and its officers, employees, and relatives; Defendants and their subsidiaries, officers, and directors; and governmental entities.

157.   Numerosity: the Class consists of members so numerous and geographically dispersed that joinder of all members is impracticable, as Defendants employ thousands of similarly-situated individuals across the United States.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

158.   All members of the Class are ascertainable by reference to objective criteria, as Defendants have access to names, addresses, and other contact information for Class members that can be used for notice purposes.

159.   <u>Common Questions of Law and Fact Predominate</u>: There are many questions of law and fact common to Plaintiffs and the Class, and those questions substantially predominate over any questions that may affect individual members of the Class. Common questions that drive the litigation include:

       a.   Whether Westways provided or obtained Plaintiffs and the Class for their labor;

       b.   Whether Westways engaged in a pattern or practice of failing to pay foreign nurses the prevailing wage;

       c.   Whether Westways' standard Buyout Calculations, Early Termination Penalty, and others constitute threats of serious harm under the TVPRA;

       d.   Whether Westways' standard terms related to termination of immigration petitions, initiation of litigation, "loser pays" provision, and others constitute threats of serious harm under the TVPRA;

       e.   Whether Westways' standard terms related to termination of immigration petitions, initiation of litigation, "loser pays" provision, and others constitute abuse of legal process under the TVPRA;

       f.   Whether UHS may be deemed the employer of Plaintiffs and the Class;

       g.   Whether UHS benefited, financially or otherwise, from the labor of the Class members;

       h.   Whether UHS knew or should have known of Westways'

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

misconduct;

i.    Whether the terms of Westways' Contract of Employment or travel assignments are enforceable;

j.    Whether Defendants' conduct violated the TVPRA; and

k.    Whether Westways' conduct violated the CTVPA.

160.    Typicality: Plaintiffs' claims are typical of other members of the Class because all the claims arise from the same course of conduct by Defendants and are based on the same legal theories.

161.    Adequacy of Representation: Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the Class members whom they seek to represent. Plaintiffs have retained counsel with substantial experience in prosecuting complex class action litigation, including claims under the TVPRA. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of Class members and have the financial resources to do so. The Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

162.    Superiority of Class Action: Class treatment is superior to individual treatment, as it will permit a large number of similarly situated persons to prosecute their respective class claims in a single forum, simultaneously, efficiently, and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce. Absent a class action, most of the members of the Classes would find the cost of litigating their claims to be prohibitive and would have no effective remedy.

163.    To the extent not all issues or claims, including the amount of damages, can be resolved on a class-wide basis, Plaintiffs invoke Federal Rule of Civil Procedure 23(c)(4), reserving the right to seek certification of a class action with respect to particular issues, and Federal Rule of Civil Procedure 23(c)(5), reserving

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

the right to divide the class into subclasses. To the extent Plaintiffs seek declarative or injunctive relief, Defendants have acted or refused to act on grounds that apply generally to the class, rendering certification under Rule 23(b)(2) appropriate.

<u>COUNT I</u>

**<u>FORCED LABOR, 18 U.S.C. §§ 1589(A), 1595</u>**

*<u>On Behalf of Plaintiffs and the Class against All Defendants</u>*

164.   Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the foregoing allegations with the same force and effect as if set forth herein.

165.   It is a violation of the TVPRA to "knowingly provide[] or obtain[] the labor or services of a person ... (2) by means of serious harm or threats of serious harm .. ; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm ...." 18 U.S.C. § 1589(a).

166.   The TVPRA defines "serious harm" to include nonphysical harm, "including psychological, financial, or reputational harm, that is sufficiently serious ... to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services to avoid incurring that harm." *Id*. § 1589(a)(2).

167.   Defendant Westways knowingly provided and obtained the labor and services of Plaintiffs and Class Members by means of serious harm and threats of serious harm, including without limitation:

> a.   the abuse of the immigration sponsorship process by fraudulently leading Plaintiffs and the members of the Class to believe that they would be employed and compensated at the rate required by their Contract of Employment, as represented to the U.S. Government;

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

b.    the abuse of legal process through threatened termination of visa sponsorship, threatened reporting to credit reporting agencies and governmental authorities such as the Internal Revenue Service, and threatened litigation;

c.    exorbitant buyout and early termination penalties, used to exert pressure on Plaintiffs and other members of the Class to continue working for the Defendants and to refrain from seeking employment elsewhere.

168.    Defendant Westways knowingly provided and obtained the labor and services of Plaintiffs and Class Members by means of a scheme, plan, or pattern intended to cause Plaintiffs and other members of the Class to believe that, if they did not perform such labor or services, they would suffer serious harm, including without limitation, psychological, financial or reputational harm, that would be sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

169.    Defendant Westways knowingly provided and obtained the labor and services of Plaintiffs and other members of the Class by means of abuse of the legal process, including threats of terminating the I-140 Petition filed on Plaintiffs' behalf, threats of initiating litigation, and threats of reporting Plaintiffs to authorities, including collections and the Internal Revenue Service that would be sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

170.    UHS knowingly benefitted from engaging in a venture with Westways to procure the labor or services of Plaintiffs and other members of the Class.

171.    UHS knew or should have known that the venture engaged in acts in

violation of the TVPRA.

172.   UHS knew or acted in reckless disregard of the fact that Westways engaged in a violation of the TVPRA.

173.   Plaintiffs and Class Members suffered damages as a direct and proximate result of Defendants' conduct.

174.   Plaintiffs and Class Members are entitled to compensatory and punitive damages in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT II

## TRAFFICKING IN FORCED LABOR, 18 U.S.C. §§ 1590(A), 1595

*On Behalf of Plaintiffs and the Class Against All Defendants*

175.   Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the foregoing allegations with the same force and effect as if set forth herein.

176.   It is a violation of the TVPRA to "knowingly recruit[s], harbor[], transport[], provide[], or obtain[] by any means, any person for labor or services in violation of this chapter."

177.   By reason of the conduct described above, defendants were perpetrators of violations of 18 U.S.C. §§ 1589, having knowingly obtained and provided the forced labor and services of Plaintiffs and Class Members by one or more of the prohibited means.

178.   Westways actively and knowingly recruited and transported Plaintiffs and Class members from foreign countries to work for Defendants in the U.S. in violation of 18 U.S.C. §§ 1589 and 1590.

179.   Westways knowingly harbored Plaintiffs and Class Members for labor or services in violation of 18 U.S.C. §§ 1589 and 1590, and provided them to medical facilities within the U.S. Health System, including defendant UHS, to perform such labor or services.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

180.   UHS knowingly benefitted from engaging in a venture with Westways to obtain the labor or services of Plaintiffs and other members of the Class.

181.   UHS knew or should have known that the venture engaged in acts in violation of the TVPRA.

182.   UHS knew or acted in reckless disregard of the fact that Westways engaged in a violation of the TVPRA.

183.   Plaintiffs and Class Members suffered damages as a direct and proximate result of Defendants' conduct.

184.   Plaintiffs and Class Members are entitled to compensatory and punitive damages in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## **COUNT III**

## **HUMAN TRAFFICKING UNDER CALIFORNIA CIVIL CODE § 52.5**

*On Behalf of Plaintiffs and the CTVPA Subclass Against Defendant Westways*

185.   Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the foregoing allegations with the same force and effect as if set forth herein.

186.   California Civil Code section § 52.5 allows a victim of human trafficking, as defined in California Penal Code § 236.1, to recover, in a civil action, actual damages, compensatory damages, punitive damages, injunctive relief, and any other appropriate relief, as well as attorney's fees and costs of suit. California Civil Code § 52.5(b) allows a victim of human trafficking to recover treble damages.

187.   A victim may bring a claim under California Civil Code § 52.5 against any person who violates or deprives the victim of their personal liberty with the intent to obtain forced labor or services, or who restricts the victim's liberty through fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury. Forced labor or services means labor or services that are performed or provided by a person, and are obtained or maintained through force, fraud, or coercion, or equivalent

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

conduct that would reasonably overbear the will of the person.

188.   Defendant Westways fraudulently induced Plaintiffs and Class Members into entering an employment relationship and in bringing the foreign nurses to the U.S. Westways then used threats, fraud, deceit and coercion to overbear the foreign nurses' wills, and to deprive them of liberty by forcing them to sign Travel Assignment Agreements placing them at healthcare facilities in different geographical areas, for wages lower than required by their Contract of Employment and immigration laws, all while being assigned to departments where they were required to perform functions without proper training and/or qualifications.

189.   Westways' threats to use governmental authorities, credit reporting agencies, and exorbitant buyout and early termination penalties to exert pressure on Plaintiffs and other members of the Class to continue working for the Defendants and to refrain from seeking employment elsewhere constitute a deprivation of Plaintiffs and Class Members' liberty.

190.   Through such actions, Westways acted with malice, oppression, fraud and duress, and subjected the Plaintiffs and Class Members to human trafficking.

191.   As a result, the Plaintiffs and Class Members have sustained damages, including emotional distress and economic losses, entitling them to damages in an amount to be proven at trial and reasonable attorney's fees.

192.   Westways is liable to Plaintiffs and Class Members for treble damages and punitive damages in amounts to be proven at trial.

193.   Plaintiffs and Class Members seek injunctive relief in the form of a declaration or court order that the Compensatory Damages for Employer clause (buyout calculation) and the "loser pays" provision in Westways' Contracts of Employment, and the early termination provision in the Travel Assignment Agreements are void and unenforceable, and enjoining Westways from seeking to enforce any of these provisions against any Plaintiff of Class Member in any way.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

# **COUNT IV**

# **DECLARATORY JUDGMENT**

## *On Behalf of Plaintiffs and the Class*

194.   Plaintiffs hereby repeat, reiterate, and incorporate by reference each of the foregoing allegations with the same force and effect as if set forth herein.

195.   Westways' threats to use governmental authorities, credit reporting agencies, and exorbitant buyout and early termination penalties to exert pressure on Plaintiffs and other members of the Class to continue working for the Defendants and to refrain from seeking employment elsewhere constitute threats of serious harm and abuse of the legal process within the meaning of the TVPRA and CTVPA.

196.   Westways' threats to use governmental authorities, credit reporting agencies, and exorbitant buyout and early termination penalties are designed to cause Plaintiffs and Class Members to continue working for Defendants and refrain from leaving their employment, notwithstanding their failure to pay Plaintiffs and Class Members the legally required and/or contracted compensation.

197.   Plaintiffs and Class Members were coerced to perform labor or services for Defendants in order to avoid incurring the threatened harm.

198.   The Compensatory Damages for Employer clause (buyout calculation) and the "loser pays" provision in Westways' Contracts of Employment, and the early termination provision in the Travel Assignment Agreements, are intended to keep Plaintiffs and Class Members in a position of involuntary servitude through nonviolent coercion.

199.   The Compensatory Damages for Employer clause and the "loser pays provision in Westways' Contracts of Employment and the early termination clause in the Travel Assignment Agreement are unenforceable penalties.

200.   The amount of the buyout calculation, loser pays, and early termination penalties are disproportionate to the compensation of Plaintiffs and Class members.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

201. The buyout, loser pays, and early termination penalties are a result of unequal bargaining power and a contract of adhesion.

202. The buyout, loser pays, and early termination penalties are unenforceable under the Thirteenth Amendment to the United States Constitution.

203. The buyout, loser pays, and early termination penalties are unenforceable under the Anti-Peonage Law, 42 U.S.C. § 1994.

204. The buyout, loser pays, and early termination penalties are unenforceable under California law.

205. Plaintiffs and Class Members have a definite and concrete dispute with Westways concerning the enforceability of the buyout, loser pays, and early termination penalties in the Contract of Employment and Travel Assignment Agreements.

206. The dispute touches the legal relations of parties having adverse legal interests.

207. The dispute is real and substantial.

208. The dispute admits of specific relief through a decree of a conclusive character.

209. The dispute involves a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

## **PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A. That the Court certify this action as a Class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper Class Representatives, and appoint Plaintiffs' counsel as Class Counsel;

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

B.      That the Court award Plaintiffs and the Class all damages available at law, including punitive damages, in an amount to be determined at trial;

C.      That the Court award reasonable attorneys' fees, costs, and expenses as provided by law;

D.      That the Court order the payment of pre- and post-judgment interest to the extent it is allowed by law;

E.      That the Court declare the Compensatory Damages for Employer clause (buyout calculation) and the "loser pays" provision in Westways' Contracts of Employment, and the early termination provision in the Travel Assignment Agreements to be unenforceable, and enjoin Defendant Westways from seeking to enforce these provisions; and

F.      That the Court grant all other equitable, remedial, and legal relief as it deems just and proper under the circumstances.

Dated: May 6, 2024                    Respectfully submitted,

_/s/  Daniel S. Robinson_
Daniel S. Robinson (SBN 244245)
Michelle West (SBN 228737)
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Dr.
Newport Beach, CA 92660
(949) 720-1288; Fax: (949) 720-1292
drobinson@robinsonfirm.com
mwest@robinsonfirm.com

**STUEVE SIEGEL HANSON LLP**
George A. Hanson (*pro hac vice forthcoming*)
Alexander T. Ricke (*pro hac vice forthcoming*)
Larkin E. Walsh (*pro hac vice forthcoming*)
Brandi S. Spates (*pro hac vice forthcoming*)
Crystal Cook Leftridge (*pro hac vice forthcoming*)
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
(816) 714-7100
*hanson@stuevesiegel.com*
*ricke@stuevesiegel.com*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

*walsh@stuevesiegel.com*
*spates@stuevesiegel.com*
*cook@stuevesiegel.com*

*Counsel for Plaintiffs and the Putative Class*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

## JURY DEMAND

Plaintiffs are entitled to and hereby demand a jury trial on all issues so triable.

Dated: May 6, 2024                Respectfully submitted,

_/s/  Daniel S. Robinson_
Daniel S. Robinson (SBN 244245)
Michelle West (SBN 228737)
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Dr.
Newport Beach, CA 92660
(949) 720-1288; Fax: (949) 720-1292
drobinson@robinsonfirm.com
mwest@robinsonfirm.com

**STUEVE SIEGEL HANSON LLP**
George A. Hanson (_pro hac vice forthcoming_)
Alexander T. Ricke (_pro hac vice forthcoming_)
Larkin E. Walsh (_pro hac vice forthcoming_)
Brandi S. Spates (_pro hac vice forthcoming_)
Crystal Cook Leftridge (_pro hac vice forthcoming_)
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
(816) 714-7100
_hanson@stuevesiegel.com_
_ricke@stuevesiegel.com_
_walsh@stuevesiegel.com_
_spates@stuevesiegel.com_
_cook@stuevesiegel.com_

_Counsel for Plaintiffs and the Putative Class_

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL